Eric G. Benson (No. 10414)
Brett R. Parkinson (No. 10310)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Fax:    (801) 532-7543
Email: bparkinson@rqn.com
        ebenson@rqn.com

*Attorneys for Defendant My Doctor Suggests LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     vs.<br><br>MY DOCTOR SUGGESTS LLC (d/b/a My Health Supplier), a Utah limited liability company; GP SILVER, LLC, a Utah limited liability company; and GORDON PEDERSEN, an individual,<br><br>              Defendants. | **DEFENDANT MY DOCTOR SUGGESTS, LLC'S MEMORANDUM IN OPPOSITION TO *EX PARTE* MOTION AND MEMORANDUM OF LAW FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>**(Expedited Consideration Requested)**<br><br>Case No. 2:20-cv-00279 DBB<br>Judge: David Barlow |

Defendant My Doctor Suggests LLC ("MDS"), by and through undersigned counsel,

hereby files this Memorandum in Opposition to the United States' *Ex Parte* Motion for a

Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should

Not Issue (the "Motion").[1]

---

[1] As discussed more fully below, the United States carries the burden to demonstrate it is entitled
to the entry of a temporary restraining order and preliminary injunction in the above-entitled

# INTRODUCTION

Through the above-entitled action, the Government seeks to preliminarily enjoin MDS from marketing and selling its silver products.  The Government's position is not supported by law, but more to the point, the preliminary injunction the Government currently seeks is unnecessary because MDS (1) will agree to be enjoined from violating the federal wire and mail fraud statutes; (2) will agree to issue unqualified refunds to consumers that purchased its products based on Defendant Pedersen's unauthorized COVID-19 claims from January 30, 2020, to the entry of the TRO; (3) has already removed all advertising materials featuring Defendant Pedersen and his claims regarding MDS's products and their effect on the novel coronavirus, COVID-19; and (4) is in the process of expelling Defendant Pedersen from MDS, which would eliminate his ownership interest in MDS, and take away any associated management powers he previously had with MDS.  Because the Government's case exclusively relies on claims made by Pedersen relating to COVID-19, MDS's post-TRO actions (and agreement to the core purposes of the Government's requested injunctive relief) demonstrate that the expansive and overly-broad preliminary injunction requested by the Government, which would continue to halt MDS' lawful business and freeze its assets, is neither supported by fact nor law.

---

action.  Thus, it is inappropriate for the United States to try to shift the burden to MDS by styling the Motion as an "Order to Show Cause Why a Preliminary Injunction Should not Issue." Accordingly, MDS responds to the Motion as a simple motion for preliminary injunction.

## BACKGROUND[2]

1.      MDS was initially formed in 2012 for the purpose of marketing and selling silver

products.  *See* Declaration of Ralph D. Malone (the "Malone Decl."), ¶ 3, attached hereto as

Exhibit A.

2.      In January of 2019, Gordon Pedersen ("Pedersen") joined MDS and eventually

obtained a 25% ownership interest of the company.  *Id*. at ¶ 4.

3.      From 2012 to 2019, MDS continued to consistently grow its silver business to the

public through various marketing channels.  *See id*. at ¶ 3; *see also* Declaration of Douglas J.

Godkin (the "Godkin Decl."), ¶ 4, attached hereto as Exhibit B.

4.      MDS advertises its products through various marketing channels, including

Facebook, telephone sales, a retail website, and through various wholesale vendors.  *See* Godkin

Decl. at ¶ 4.

5.      MDS's customers may elect to be automatically billed each month for certain

MDS products and thereby receive monthly shipments of MDS's products.  *Id*. at ¶ 5.

6.      One metric MDS uses to measure customer satisfaction is the retention of

customers on the automatic monthly billing plans.  *Id*. at ¶ 6.

7.      MDS retains nearly 95% of its customers after three months of receiving

automatic shipments of MDS's products, indicating that MDS has unprecedented customer

satisfaction for its silver products and customer service.  *Id*.  at ¶ 7.

---

[2] The background provided in this section is not an exhaustive rebuttal to the hundreds of pages
filed by the Government in support of its Motion, rather, it provides context to the claims
asserted by the Government.  Facts specifically relevant to the applicable legal standards are
more fully discussed and refuted in conjunction with the relevant applicable legal standard.

8.      Another metric used to measure customer satisfaction is the company's "chargeback" rate.  The "chargeback" rate is the rate at which customers "chargeback" a purchase to their credit cards, essentially receiving a refund from their credit card company for a purchase.  This typically only occurs when a customer is not satisfied with the product.  *Id*. at ¶ 8.

9.      MDS's chargeback rate falls far below 1%, meaning less than 1% of customers are so dissatisfied with MDS's products or services that they sought a refund through their credit card.  *Id*. at ¶ 9.

10.     In March of 2020, MDS became aware that Pedersen had made claims regarding MDS's products and their efficacy to treat or prevent the novel coronavirus, COVID-19.  *Id*. at ¶ 10; *see also* Malone Decl. at ¶ 7.  Prior to that point, MDS was unaware that Pedersen was making such claims on Youtube or through other media.  *See* Godkin Decl. at ¶ 10 and Malone Decl. at ¶ 7.

11.     Immediately upon discovering Pedersen's claims, MDS removed all marketing content that referred to or related to COVID-19.  *See* Godkin Decl. at ¶ 8.  MDS verified that all COVID-19 related marketing material created by Pedersen on MDS's behalf was removed from all marketing channels.  *Id*.

12.     The Company does not take the position that its silver, or any other, products can treat, cure, or prevent the novel coronavirus COVID-19, and Pedersen's claims were inconsistent with company policy.  *Id*. at ¶ 9.

13.     Based on Pedersen's breach of company policy, MDS initiated expulsion proceedings pursuant to MDS's operating agreement and intends to fully remove Pedersen from

the company consistent with the operating agreement and applicable law.

14.     To a reasonable degree, MDS, through its sales tracking programs, can isolate which of its sales were made to consumers who likely saw Pedersen's claims regarding COVID-19. *See generally* Godkin Decl. at ¶¶ 11-15.

15.     Specifically, the only revenue streams potentially impacted by Pedersen's COVID-19 claims are those which originated through MDS's retail website (per Pedersen's links to MDS's website from his personal and unaffiliated sites) and through MDS's telephone sales campaign. *Id*. at ¶ 11.

16.     Of the nearly 7,497 sales made from January 2020 to April 28, 2020 on the website and telephone sales campaigns, nearly one-third of the total sales (2,273 to be precise) were a result of automatic monthly sales that originated before Pedersen's COVID-19 claims were made. *Id*. at ¶ 12.

17.     In December of 2019 and January of 2020 (prior to Pedersen's COVID-19 claims), MDS experienced 1.2% growth per month in its sales on its website and telephone sales campaigns. *Id*. at ¶ 13.  Thus, MDS estimates that several thousands of its sales during January 2020 to April 28, 2020 can be attributed to MDS's demonstrated and natural growth in business. *Id*.

18.     Further, MDS estimates that only $126,500 of nearly $1,800,000 in sales revenues on silver products during the relevant timeframe could potentially have occurred as a result of Pedersen's COVID-19 claims.  *Id*. at ¶ 14.   This estimation is based on the average sales conversion rates from advertising videos.  *Id*.

19.     The sales that originated through myriad other sales channels (recurring auto shipments, direct sales, nutritional stores, referrals, etc.) were likely not affected by Pedersen's claims regarding MDS's silver products and their efficacy in treating, preventing, or curing the novel coronavirus, COVID-19.  *Id*. at ¶ 15.   Thus, the vast majority of MDS's revenues from January 2020 to April 2020 were not a result of Pedersen's claims.  *Id*.

20.     Since the entry of the Temporary Restraining Order ("TRO") and the asset freeze in the above-entitled action, hundreds of customers have contacted MDS as their frustration over not receiving MDS products has continued to mount.  *Id*. at ¶ 16.  Because of the restrictions of the TRO, MDS has been unable to even contact these customers to let them know what is going on.  *Id*.

21.     MDS currently has a number of consumers who paid for silver products in the days prior to the entry TRO, but have not received those products already paid for, or a refund if necessary, based on the TRO.  *Id*. at ¶ 17.

22.     MDS also has roughly $350,000 in various outstanding business obligations to its vendors and business partners which have not been met because of the current TRO and asset freeze which froze MDS's assets that would otherwise be available to pay these vendors.  *See* Malone Decl. at ¶ 11.

## ARGUMENT

### I.     <u>LEGAL STANDARD</u>.

In order to prevent a "*continuous and substantial injury* to the United States or to any person or class of persons," 18 U.S.C. § 1345 gives the Government the authority to seek an injunction when a person has violated or is about to violate one of the predicate statutes, which

6

include mail fraud or wire fraud, 18 U.S.C. § 1341 and § 1343.  *See* 18 U.S.C. § 1345 (emphasis

added).  "[A] movant seeking a preliminary injunction must establish (1) a substantial likelihood

of success on the merits; (2) irreparable injury to the movant if the injunction is denied; (3) the

threatened injury to the movant outweighs the injury to the party opposing the preliminary

injunction; and (4) the injunction would not be adverse to the public interest."  *United States v.*

*Terry*, No. CIV-19-25-SLP, 2019 WL 7753271, *1 (W.D. Okla. Mar. 26, 2019) (citing *Dominion*

*Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154-55 (10th Cir. 2001)); *see*

*also United States v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020) (citing

the elements for permanent injunctive relief pursuant to 18 U.S.C. § 1345).  "The court may

grant injunctive relief *only* where it has concluded a movant 'has established all four elements'

of the traditional injunction analysis."  *United States v. Greenwood*, No. 2:19-CV-249, 2019 WL

3717679, at *2 (D. Utah Aug. 7, 2019).

## II.     THE GOVERNMENT CANNOT MEET ITS BURDEN FOR PRELIMINARY INJUNCTIVE RELIEF.

### A.     Substantial Likelihood of Success on the Merits.

For purposes of this Response, MDS concedes that Pedersen likely made unsupported

claims regarding MDS's silver products specifically related to their effectiveness in combating

COVID-19, which could potentially result in probable cause establishing a basis for charges

against him under the federal wire and mail fraud statutes.

### B.     The Government Cannot Demonstrate That It Will Suffer Irreparable Injury Without the Issuance of the Requested Injunction.

"In defining the contours of irreparable harm, case law indicates that the injury 'must be

both certain and great, and that it must not be merely serious or substantial.'"  *Dominion Video*

7

*Satellite*, 356 F.3d at 1262 (10th Cir. 2004) (citation omitted).  Consistent with the second prong

of the preliminary injunction standard, 18 U.S.C. § 1345 also requires that there be a "continuous

and substantial injury to the United States or to any person or class of persons" to justify

injunctive relief.  *See* 18 U.S.C. § 1345.  As discussed above, the Government's Complaint and

requested injunctive relief are based on claims made by Pedersen himself regarding the efficacy

of MDS's silver products in treating, preventing or curing the novel coronavirus, COVID-19.

*See generally* Complaint and Motion.

Notably, upon discovering Pedersen's claims regarding COVID-19 (and prior to the

filing of the Complaint and the entry of the TRO) through social media channels, MDS removed

the materials from the public view.  Aside from Pedersen's aberrational conduct, never did MDS

as a company represent to consumers that its silver products treated, prevented or cured any

disease or virus, let alone the novel coronavirus, COVID-19, whose effects have shaken the

world in the past few months.

Based on Pedersen's unauthorized and misleading statements about the silver product's

efficacy in treating, preventing or curing the novel coronavirus, COVID-19, the company

initiated expulsion proceedings against Pedersen pursuant to the operating agreement and

applicable law.

In addition to the actions MDS has already taken to resolve the issues with Pedersen and

the claims he made regarding the silver product's efficacy in treating, preventing, or curing the

novel coronavirus, COVID-19, MDS, through negotiations with the Government,  has already

offered to stipulate to an injunction prohibiting the company, or any of its officers or agents,

from "committing further violations of the mail fraud and wire fraud statutes" and agrees that it

will not make claims regarding its silver products and their use in combating COVID-19.  Also, MDS will agree to take any necessary remedial action with consumers to address Pedersen's false claims.  MDS will agree to offer unqualified refunds to any consumer who purchased the product based on Pedersen's misleading claims from January 30, 2020, to the date the TRO issued.

Additionally, MDS plans to issue disclaimers to consumers making it clear that its products do not prevent, treat or cure any disease or virus, including the novel coronavirus, COVID-19.  MDS has also retained compliance consultants to ensure that MDS remains in full compliance with applicable law.  In light of this evidence, the Government's request to completely enjoin MDS from marketing and selling its silver products altogether is unfounded and is certainly beyond the injunctive relief necessary to ensure consumers are not injured.  Given the actions MDS took prior to the filing of the Complaint and Motion, and MDS's post-TRO conduct including an offer to stipulate to the primary conduct at issue in this matter, the Government cannot show that it will be irreparably harmed by MDS, or that MDS presents a continuous or substantial threat to the Government or the public.  The harm created by Pedersen has stopped.

     **C.**    **The Injury Caused By the TRO and Preliminary Injunction To MDS Outweighs the Hypothetical Continuing Injury Suffered by the Government.**

As discussed above, the Government cannot show that MDS poses a continuous or substantial threat to the Government, or to the general public.  Once again, MDS will stipulate to not commit wire or mail fraud, and will agree to not make any false or misleading statements regarding their products' efficacy in treating, preventing or curing any disease or virus.  Without a threat of continuous or substantial danger to the Government, or to the public, through

violations of the mail and wire fraud statutes, the Government does not have authority under Section 1345 to continue to enjoin MDS from marketing and selling its products to the public nor can it use Section 1345 (a criminal statute) to indefinitely freeze MDS's assets without making a showing that MDS's assets are specifically related to Pedersen's claims.  The Government has not proven that the entirety of the frozen assets resulted from fraudulent sales and thus the asset freeze is overbroad and must be lifted.  A continued freeze of MDS' assets will quickly decimate the business altogether, a result clearly not contemplated by the narrow temporary injunctive relief ordered by this Court on April 28.  Ironically, this continued damage to the business—and to thousands of consumers who have regularly enjoyed the product and have never seen, or been influenced by, Pedersen and his claims—far outweighs the hypothetical damage the Government claims it will suffer if the preliminary injunction does not issue.

Indeed, MDS has already suffered significant damage as a result of the TRO, and will continue to suffer damage should a preliminary injunction continue to halt its business and freeze its assets.  MDS owes a number of its vendors and business partners approximately $350,000 that it cannot pay due to the asset freeze.  Eventually, without payment, MDS's business partners and vendors will likely cease working with MDS.  Also, as noted above, a number of consumers purchased silver products in the days immediately prior to the TRO and have not received the already-paid-for product.  Predictably, those consumers are upset and continue to contact the company about when they can receive the products they've already paid for.  A continuation of the TRO in the form of a preliminary injunction will continue to deprive those consumers of receiving goods they are owed as a result of a valid bargained-for-exchange with the company.

The data shows that MDS customers are overwhelmingly satisfied with their purchases from MDS, which is demonstrated by MDS's high retention rate of customers and its infinitesimally small chargeback rate.  In short, consumers believe in MDS and its products and have expressed frustration to MDS that they are no longer able to obtain MDS's products. Accordingly, this factor weighs heavily in MDS's favor.

      **D.**      **Entry of the Requested Preliminary Injunction is Not in the Public's Interest.**

The Government, without evidence of broader wrongdoing by MDS (aside from Pedersen's unauthorized actions) or evidence that MDS's product is inherently unlawful, seeks to ultimately permanently enjoin MDS from doing business altogether.  As MDS has demonstrated above, the Government's request is overly broad and is inconsistent with existing law.  Ultimately, depriving a party from lawfully providing a product free from Pedersen's representations, as MDS demonstrated it intends to do, is clearly not in the public's interest. Indeed, thousands of consumers in the general public have enjoyed the product, completely independent of Pedersen's statements for a few months in 2020, and having the business effectively shuttered through court order is not in the consumer's interest either.  Accordingly, the public interest favors denying the requested preliminary injunction.

**III.**      **THE REQUESTED ASSET FREEZE IS NOT SUPPORTED BY SECTION 1345.**

The Government's request for an open-ended asset freeze is not supported by 18 U.S.C. § 1345.  Specifically, the Government has not shown that the entirety of the assets frozen pursuant to the TRO issued in the above-entitled action came as a result of Pedersen's claims.  *See United States v. Fang*, 937 F.Supp. 1186, 1198-99 (D. Md. 1996).  As outlined previously, the vast majority of MDS's sales came through channels wholly unrelated to Pedersen's claims or

entirely preceded Pedersen's claims.  To a reasonable degree, MDS can show that less than $200,000 in gross revenues originated from advertising channels with any potential connection to Pedersen – i.e. the vast majority of MDS's revenues originated through marketing channels wholly unrelated to Pedersen's claims.  Based on the allegations in its pleadings, and supporting exhibits, the Government has not traced sales in a manner to show otherwise.  Thus, the continued asset freeze is not supported by the facts or law.  In light of MDS's agreement to issue unqualified refunds to any customer that purchased products from MDS during the relevant period of January 30, 2020 to the present based on Pedersen's misstatements, any continued asset freeze is unnecessary.

Also, at this point, there is no parallel criminal case pending against MDS that would support a continued asset freeze in order to provide for criminal restitution. *See Fang*, 937 F.Supp. at 1202 (holding that assets subject to a freeze order may be released if no criminal proceeding was commenced against defendant).  To be transparent, MDS is in talks with the criminal AUSA looking into this case.  Importantly, as part of any criminal matter, restitution could only result to the extent the government could trace the specific assets back to relevant criminal conduct, i.e. Pedersen's unauthorized COVID-19 claims.  That said, with MDS's agreement to issue unqualified refunds to customers who purchased the product in reliance on Pedersen's unauthorized COVID-19 claims, no restitution would be owing in the event that MDS is eventually charged in a parallel criminal proceeding.[3]  Accordingly, the asset freeze is unnecessary and falls outside of the scope of 18 U.S.C. § 1345.

---

[3] If MDS is eventually charged with misdemeanor violations of 21 U.S.C. §§ 331(a), 333(a)(1), Introduction of Misbranded Drugs into Interstate Commerce, the Mandatory Victim Restitution

## IV.    THE CIRCUMSTANCES WARRANT EXPEDITED TREATMENT

Based on the detrimental impact the continued TRO and asset freeze has had (and will continue to have) on MDS's lawful business operations (as articulated more fully above), and the fact that the settlement discussions with the Government appear to have stalled, MDS requests expedited consideration of the Government's Motion.

## CONCLUSION

For these reasons, MDS respectfully requests that this Court **DENY** the Government's Motion for Preliminary Injunction.

DATED this 12th day of June, 2020.

RAY QUINNEY & NEBEKER P.C.


_/s/  Eric G. Benson_
Eric G. Benson
Brett R. Parkinson

*Attorneys for My Doctor Suggests LLC*

---

Act, 18 U.S.C. § 3663A, does not apply to such charges and restitution, if any, would not be mandatory.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 12th day of June, 2020, I electronically submitted the

foregoing **DEFENDANT MY DOCTOR SUGGESTS, LLC'S MEMORANDUM IN**

**OPPOSITION TO *EX PARTE* MOTION AND MEMORANDUM OF LAW FOR A**

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A**

**PRELIMINARY INJUNCTION SHOULD NOT ISSUE** to the Clerk of the Court using the

EC/ECF system, which sent notification of such filing to the following:

> Speare I. Hodges
> Sarah Williams
> Consumer Protection Branch
> United States Department of Justice
> 450 5th Street, N.W. Suite 6400-South
> Washington, D.C. 20001
>
> John W. Huber
> Joel A. Ferre
> United States Attorney's Office
> District of Utah
> 111 South Main Street, Suite 1800
> Salt Lake City, UT 84111
> Joel.ferre@usdoj.gov

/s/ *Katherine E. Priest*

14